The 4th District Appellate Court of the State of Illinois has now convened, the Honorable Catherine E. Zienoff presiding. Thank you. Good morning, counsel. This is 4-220905, In Re, the marriage of Lori A. Hardy and John C. Hardy Jr. Would counsel for the appellant please introduce yourself? Good morning, Justice. My name is Stuart Schiffman. I represent Lori Hardy. Thank you. And would counsel for the appellee introduce yourself, please? Good morning, Justices. My name is Gregory Scott and I represent the appellee, John Hardy. Thank you very much. At this time, are counsel ready to proceed? Yes. Yes, Your Honor. Thank you. Mr. Schiffman, you may begin your argument. Thank you. Good morning, Justice Zienoff, and may it please the court. I do appear here this morning for Lori Hardy, who is appealing an order from the Circuit Court of Sangamon County that terminated maintenance in her 20-plus year marriage to John Hardy. The history of the case, the brief history of the case is that this court, this appellate court roughly 10 years ago overturned another circuit court ruling in Sangamon County that had awarded Ms. Hardy maintenance for a period of two years. That order from the appellate court awarded Ms. Hardy permanent maintenance in the sum of $2,000 a month, which was then entered and the parties proceeded until a hearing in September of 2022 when the Circuit Court of Sangamon County terminated maintenance based upon a finding that Ms. Hardy was cohabitating with a gentleman named Rob Ross. Counsel, good morning again. If I might ask a question with respect to that, please. It is appropriate, is it not, if the court does find that the party receiving maintenance cohabits with another on a resident continuing conjugal basis, as you mentioned, what part of this definition does not apply here? The part of this definition that does not apply, Justice Zienoff, is the extension that has come about over the recent years where the cohabitation provision is now deemed a de facto marriage. The trial court in this case found that the parties were in a de facto marriage. It is our position that the evidence that was presented did not establish a de facto marriage. Instead, it established an intimate dating relationship between Mr. Ross and Ms. Hardy, and that would be insufficient to find as a basis for terminating maintenance. The six factors, the Heron factors, and also factors that were discussed in Miller, are present here, were they not, with respect to the length of the relationship, the time they spent together, the nature of the activities, both social and work, their personal affairs were intertwined. They did occasionally take vacations together, and they spent some holidays together, so why not? Respectfully, Justice Zienoff, they did not take vacations together. In fact, they had taken one vacation, and that actually predated this court's ruling in 2013. If you go back and look at that opinion, you will see that that was mentioned because that issue had been raised in the initial trial. Mr. Hardy and his counsel had suggested that Mrs. Hardy not receive any maintenance whatsoever because she was cohabitating with Mr. Ross back then. Now, insofar as the factors go, I will concede that there is some evidence, perhaps, on some of the factors. This has been a relationship that has existed now since the time of the original file, but the length of the relationship is only a factor, and there is no bright line that says a relationship of five years is a presumption that the parties are in a de facto marriage. In looking through all the cases, the longest relationship that I have seen is a relationship of 15 years, which was discussed by the Supreme Court in the Bates case, so I don't believe that the length of the relationship, it's a factor, but you have to look at the other factors. Now, I would say respectfully that the other factors in this case do not weigh in favor of a de facto marriage. The big factor here, as I mentioned, the vacation issue, the parties do not celebrate holidays together. Excuse me. I'm sorry. Tissue. Well, let me take this opportunity just to interrupt a minute. Do all six factors have to be present? I mean, didn't Miller and Justice Jorgensen discuss the fact that now courts look at the totality of the circumstances, how these factors fit in, and here we don't just, for example, have an employer-employee relationship, but really sharing up the profits of the appellant's business, and so why wouldn't the other factors point to this permanent relationship, not a de facto marriage, as opposed to an intimate dating relationship? First of all, with respect to the employer-employee relationship, I don't believe that that's necessarily a factor that is always indicative of a de facto marriage. The relation, and the suggestion here that the parties share in the profits of this business is very weak, because there are no profits in this business. This business barely struggles to exist, and of course, because of COVID, it had some issues, but this business is not much better now than it was 10 years ago, and in fact, it just barely struggles, and Mr. Rasta receives a very minimal amount. The real, I think, crux of what makes this case an intimate dating relationship case, rather than a de facto marriage, is the lack of any kind of personal or economic entanglement. These parties do not have any kind of financial connection whatsoever. They really barely exist financially, each independently, but I'd like to, Justice Zinoff, in answer to your question, I'd like to mention a case that recently was decided long after the briefs in this case were filed, but I do want to call it to the court's attention for an answer, somewhat long, not long-winded, but an answer to your question. The case I want to mention is the marriage of Edson, E-D-S-O-N, which was decided late in June by the First District, and it's founded 2023, ILAP First, 230-236. Now, that case is only important, meaningful in the context of your question in this regard, because the question that has always bothered me in trying to answer, when do we have an intimate dating relationship, and when do we have a de facto marriage, is, well, how do we find that line? And one of the things that I think we find if we look at Edson, because Edson mentions this a couple of times, once by the trial judge and once by the reviewing court, it's kind of a backwards look at this relationship. How does the relationship, or how can the relationship end? And the answer that they seem to be giving is, well, an intimate dating relationship can end very quickly and very abruptly. It could end with a phone call, it could end with a social media message, or something of that nature. A de facto marriage ends somewhat differently. In reality, a de facto marriage ends with a de facto divorce. Many times when people have been involved for years and have a relationship of some length, they have a financial interaction. They may have some kind of a joint account, financial account. They may be paying for each other's debts or things of that nature. And when that de facto marriage comes to an end, then the parties have to do something. Anecdotally, I think all of us, given our age now, may very well know some people who are in that type of relationship. Now, it doesn't come to court very often because there's not maintenance issues or the question of maintenance or something of that nature that has to be resolved. But sometimes people in that issue either by sitting down and having somebody help them get through it, or on occasion, I've seen examples, all of us I think have seen examples, where those people have to end up going to court. And they sometimes have to fight out those issues in a separate civil lawsuit. It's not a dissolution of marriage because they were never married. On the other hand, Ms. Hardy and he would go his own way. She would go her own way. They have no financial entanglements whatsoever. The only, the major thing that would have to happen is that Ms. Hardy would probably have to find somebody else to work for her and help her resolve her, help her in her business. There is no entanglement here whatsoever. There is no commitment. They have indicated to all of their families, both of their families, that they have no intention of marriage. They have no personal... Well, counsel, let me interrupt you there. Is that record someplace? Is that specifically in the record? Was that brought up in any of the... I think in her I think in the testimony at trial, she was asked about that. He was asked about it. And they just, they don't have any intention of marriage. I want to contrast that if I could, because this morning I was rereading Heron, Marriage of Heron, which was a decision by this court a long, long time ago, decided by Justice Steigman. It was the case that's really given us kind of the result here. It's the factors that you've mentioned that are applied. And in Heron, the evidence was very clear that the parties thought about marriage, but had decided that they would not get married. Because if they did get married, Mrs. Heron, the former Mrs. Heron, would lose her maintenance payments. And so that is one of the reasons why they continued on in the relationship that existed that was kind of a sham relationship where Mr. Badger, who was her cohabitant, Mr. Badger actually would leave the house in the evenings and go back to a place where he was living that had no heat, utilities, or any other facilities of that nature. So I think that the Edson case that I've mentioned adds this one little element. I also think that the Edson case adds another important observation, at least, that the law in this area, the intimate dating relationship versus de facto marriage contest, is an ever changing one. I think that's because the domestic relations and these kinds of issues are changing a little bit, or a lot, to be honest with you. We have an aging population of people in divorce situations who may be receiving maintenance and who wish to have some type of relationship with another party, but are concerned or worried, I guess, that perhaps their maintenance might be terminated. I think each of these cases is an individual case. Each case has to be decided. And I think in this case, to be perfectly honest with you, that the I think that the... Absolutely. Excuse me. Good morning. Good morning. A couple of questions, just as it relates to those issues that have previously been raised. You were talking about the, I'll say, financial entanglements as we talked about this. Previously in this matter, much was discussed about the fact that the father had co-signed the loan, if you will, and so there seemed to be, at some point, there did seem to be more of a financial connection, at least to his family. So to what extent, as we sit here today, should the court consider those issues that were previously raised? And then my second question, slightly separate from this, there seems to be a suggestion that the court, in evaluating this, should consider her need for maintenance. And I'd like you to address that as well. Okay. Justice Leonard, I'm going to take the second one first, if I may. Certainly. We are not suggesting that her need for maintenance is a factor that the trial court should have considered or that this short court should consider. But we are mentioning this fact because this entire discussion, going all the way back to the marriage of Bates and the marriage of Sappington, always goes back to this one point. The purpose of this piece of legislation, the purpose of terminating maintenance, if a party is cohabiting with another, is to eliminate what I think the courts have called the inequities that might be raised with a, if a person is receiving financial support from a, we'll call it a second person, then the person who was ordered to give financial report, the previous spouse, should not have to also give financial support. So you can't look at the equitable situation without at least some consideration of the economic issues that are going on. Now, since you've asked that question, look at this case, look at this case very clearly. Ms. Hardy, and when you look at it, go back to the very beginning, to the first ruling by this court written by Justice Kinect some 10 years ago, when he predicted very clearly and very correctly that Ms. Hardy was never going to be in a situation where she would have great financial independence and financial strength. So you have to look at that. You look at it from the, perhaps look at it from the other side. The other side, look at it from this question. Is Ms. Hardy, because of her relationship with Mr. Ross, does she have a financial windfall? Well, the answer, unfortunately, is no. She has no financial windfall. And indeed, she's facing the possibility now of basically bankruptcy, because if she has to pay back a year's worth of maintenance payments, she doesn't have that money. In this divorce, she received roughly $14,000 in cash. And originally, from the original trial judge, two years worth of maintenance. She's gone about her post-marriage life working very hard. And she hasn't been able to really improve that situation very much. So she certainly isn't benefiting financially from her relationship with Mr. Ross. Now I want to go and answer your first question about the financial entanglement. The financial entanglement here came about in part because Ms. Hardy, after 20-some years of marriage, hadn't really had much financial independence and didn't really know how to do some of the things that many of us do as a matter of course. She wanted to get a mortgage. She wanted to buy a small house. Mr. Ross's father, who had active banking connections, agreed to help her get that mortgage. And he did sign on the mortgage. But there's no evidence here whatsoever that he paid one penny on that mortgage or did anything to financially benefit Ms. Hardy. And in fact, very shortly after that mortgage was obtained, the evidence in the record was that she got a different mortgage. She refinanced. And she took his name off the loan. So his name was only on the loan for a very brief period of time. But she received no financial benefit whatsoever. I think I hope I've answered the questions. The case law is very clear. No two of these cases are alike. And I think that that's kind of what creates a little bit of a problem for all of us. I know it creates a problem, at least insofar as we look at the standard of review, which I just want to briefly touch upon. I will concede that the standard of review in this case requires us to look at the manifest weight of the evidence. That's kind of where we get our start. But the manifest weight of the evidence relates to, of course, the testimony that's heard, the evidence that's received. It's interesting to note that the Miller case, which is kind of, I think, a very important case, you know, excuse me, counsel, counsel, I don't know if you see on the screen, you don't have any time remaining. If you could just wrap up right now, please. Well, I'll just wrap up and say I believe that I'm for rebuttal. Okay, I apologize. I'm not seeing very well this morning. And I apologize for that. Plus, I will tell you that this this zoom session is not to my liking. But I will just I'll finish up by saying this. I believe that the standard of review requires the court to do a few things beyond just look at the evidence and say if there's any evidence that supports this proposition. I think that this is an issue that requires a case by case look. And a lot of the case and many of the cases now the trend is to support the intimate dating relationship. We do ask that this vacate the trial court's order, reinstate the maintenance and of course, vacate the order for any back maintenance payments. Thank you. Thank you, Mr. Shiffman. Mr. Scott. Please the court counsel. As I previously stated, I represent John Hardy, the appellee in this case. And I believe that the court's order in this case was correct. It was not only correct based upon it was correct because it's based upon the evidence. The manifest way to the evidence requires that the court only finds that if an opposite conclusion would is clearly evident, which is not the case. The judge's ruling was not unreasonable, arbitrary, or not based on the evidence. In fact, the evidence is overwhelming that there was in fact a de facto husband and wife relationship. Good morning. If you respond to opposing counsel's position specifically that especially because two factors weren't present, that is, Lori and Robin didn't vacation together and there really wasn't any financial entanglement or inner action to speak of, that this really was an intimate dating relationship, as opposed to a de facto marriage. How would you respond to counsel's position? And what do you think is regard to the vacations? Neither one of these people vacation much. They had a vacation one time before the last appellate court opinion. If you look at the Facebook postings of Miss Hardy that the private detective introduced into evidence, I think it was in our Exhibit 1 for his evidence. There is a constant reference to her and him on this vacation, pulling it back up, constantly telling the people that she loves them, this is her man, they've had eight years since that time. But neither one of these people vacation much. She would go occasionally to see her daughters in Champaign, and when one moved to Georgia, she would go down there to Georgia. When they did in fact leave, then the other party, Mr. Ross, would come to her home to take care of her animals and take care of her own. When he traveled one time, she went out and took care of his animals in his home. So I think that there's a level of commitment there that's different than just dating. With regard to the financial interaction, and this is where I think people tend to get off in cases, in my opinion, everybody's looking, do they have a joint bank account? How do they financially interact? This is a very obvious case of these two people running a business together. This is not just an employer-employee as described by the appellant in her brief, and as expressed to you this morning. She never treated him as an employee. She never filed any information with any taxing authority that claimed he was an employee. She never did a W-2, a 1099. She never filed 941s. She never did anything with regard to treating him as an employee. What they did is they shared profits. But she didn't do any reporting whatsoever, regardless of whether it was with regard to an employee or not, right? No, Justice, you're correct. She filed false tax returns, and the tax returns didn't disclose her income from her business, which was $48,000 a year. And she gave him a share of that profit. Now, Mr. Shiffman said that there's no profit. Mr. Shiffman, how is that a profit? Why do you think it's a profit? Because it's the amount they took in. And so what he did is he got his share of the amount that they took in. That was their arrangement. Well, did she have any expenses in running a cleaning business? I can see having expenses for running a cleaning business. And in fact, what they did is he went with her to pick up the supplies at Sam's. They operated this business together for 12 years. Did he help pay for those cleaning expenses? Is there any evidence of that? No, Your Honor, there's no evidence of that. But he's being paid. He's not getting part of the profit. Well, Your Honor, I don't view it that way. I view what it is is that they had an arrangement that if he did this, he got a share of what came in. That's the way I see in the testimony. And that's where I see their financial interaction. As far as when you look at whether or not you have a husband and wife relationship or a de facto husband and wife relationship, it's not just all finances. And the trial court picked that up and expressed that. This is a level of commitment between these two people that is more than just dating. One of the things that came up... So where is that additional level of commitment? As Miller talked about it, a permanence, intent to marry or certainly make sure that this is a permanent relationship, one with a deeper level of commitment that is demonstrated. Taking care of pets, anybody, a neighbor can do that. I don't see how that would really be relevant to seeing a deeper level of commitment or permanence. Justice Zinoff, there are several areas and I'd like to go through a few of those. First of all, as the court noted, when she needs or becomes afraid or has a need medically and personally, she looks to Mr. Ross. And that was very evident when they had COVID. Then when COVID came into existence, then what, as Mr. Ross described it, they sheltered in place. They stayed with each other for fear of becoming ill, for fear of dying. And it was like having you stayed with your family or closest people. Not only that, but she has some significant issues with anxiety, bipolar, her back problem. As he said, he helps her when she becomes over removes her stress. She said when she becomes scared, she has to have him around. In fact, during COVID, she said she was so scared and was, I believe her term was out of sorts or out of ability to function. She had to have him around. That is a level of commitment that you see between a spouse and a, as opposed to just a dating relationship. And they stayed together and they did that. Another area that, that it shows up in is his protection of her. They put up a Marine flag. So that way the neighbors would know. And apparently the neighborhood is a rough neighborhood. And they wanted the neighbors to know that they do not, or no one should bother her because a Marine lives in that house. That's their communication. That's his protection. When she had a problem with a neighbor, it was Mr. Ross and her who went after, went to the neighbor and confronted him. When they had a problem with Ms. Banner, who testified on behalf of, of Mr. Hardy, they went to her house and Mr. Ross confronted her. When they found out that Ms. Banner was going to testify, Mr. Ross then began to harass her by driving by her residence and, and flipping her off for lack of a better term. He, in fact, even accosted her at the trial. And another area that, that proves this level of commitment is when this all started. Ms. Hardy and Mr. Ross actually got together and composed a letter to her children, which she approved and she forwarded, which basically told her children, if you, if you don't tell Mr. Hardy to drop this claim of, to terminate maintenance, you need to use the nuclear option and terminate his right to see you and his grandchildren. Thereby, they recognized that relationship was one that was more than just dating. They recognized that this jeopardized her maintenance. They recognized that in fact, they had to do something. And the other thing they did, which the court acknowledged is like an admission that they're in this type of relationship is they started changing. Once they found out that someone was watching them, once they found out that all of their time together was documented, once they found out that them walking around the interacting with the neighbors as a couple, interacting with his, uh, his band members, going out as a couple, when they found out that they were being observed, they changed their habits. There's no reason for them to change their habits other than an admission that they knew they were in the type of relationship that would end the maintenance. If they're just dating, like, just like Mr. Schiffman just said, well, let's just go our separate ways. It doesn't make any difference. We'll just do that. They didn't do that. They took overt actions to try and change the narrative or change the observations that are there. Unfortunately for them, there is tremendous documentation of them spending time together. One of the things that, you know, as you look at all these cases, and I know that they're all different factually, but some of the weekend, that's all he came over. In the Bates case, he didn't have a key. In this case, they have keys to each other's home. And we have evidence from the surveillance that Mr. Ross took a key out of his bag. He brings his clothes over. He does his laundry there. They go shopping together. They eat together. As far as holidays, Mr. Schiffman is wrong. Mr. Ross does not celebrate what we normally refer to as regular holidays. He celebrates military holidays. And the two holidays that he normally celebrates, Memorial Day and 4th of July, as he testified to and as Ms. Ross testified to, they celebrate those together. They barbecue and he calls them date nights. So is every factor there of Heron? No, the vacationing is not there. But the interaction, the interpersonal interaction, the reliance, a spousal reliance when you're in trouble is more important than sharing a bank account, in my opinion. And that's what you have here. If she needs something, if she is in trouble, if she is panicking, her reliance is upon Mr. Ross. And Mr. Ross has been there. And they have the length of this relationship was 11 years by the time that we had the trial in August of 22. The time together is documented as frequent, regular and daily, not just for working, but for interacting and eating and going out and buying groceries, him building some stuff around a fence and watering the yard or the flowers and working in the yard, backing their cars up, those type of things, normal husband and wife living together type arrangements. His house as you know, he was just Mr. Schiffman in his brief said, Oh, you know, him, the judge saying that he assumed that, you know, that his house was not able to be habitated because his kitchen table was a gunsmith table. Well, in fact, that would severely limit somebody using a kitchen if you know, and I'm not a big gun person. It's my understanding that a gunsmith is breaking down different aspects of guns, maybe rebuilding, maybe ammo, but that that takes up a large area. He had his drum set in the living room. It was obviously not set up for like a long term or regular, regular living. And he didn't spend that much time there. He would go out there Mondays, he'd go and come. But we have a lot of overnights. The first observation, I believe that there were 16 overnights in 29 days, and he was there every day. The second one by the by the private investigators was 17 days and he was overnight half of those. And then before that, just observations, he was there overnight, the neighbor said that she's seen him for years, overnight with his truck there. So this is the permanence that I think is reflective in their lifestyle, and the one that they tried to and assistance when when emotionally upset, I think adds that extra element to this case, and it shows where the trial courts right, that the evidence is supportive of what the trial court did. It's not, you know, there's nothing to show that what the trial court in its determination, the trial court had before it, these people, the trial court had before it, their credibility. And when you have a person that's willing to lie to the federal government, who is willing to and honestly, she filed a false affidavit. If you look through the transcript, I mean, I went through numerous areas of her affidavit where she was out now untruthful to the court. And and you know, when you're when you're up there telling the court, well, you got to believe me, we're just dating. And you sit there and you present evidence where you are falsifying under penalties of perjury, your tax returns, where you are filing a intentional false affidavit with the court, knowing full well, the taxes you claim on there, you never pay the health insurance, you don't pay the, you know, the accounts are not correct. It was numerous. And, you know, I mean, I've, you know, my practice, there's a lot of times people flub up on affidavits. But this was a total false affidavit in a number of important areas. And you can't disregard that. And the fact that this court balanced their credibility, and on two occasions, I believe, in his order, he specifically mentions that they were not credible. So a person that has I'm sorry, Justice, Leonard, Leonard, I'm sorry. I was just going to ask just briefly a couple of things. It seemed to me that the first time there was a request to terminate maintenance, some of these financial issues were addressed as it related to the mortgage already, as well as the cleaning business. And I guess my question is, is there anything in the record that suggested his role in the cleaning business increased with time? Because we are talking about a substantial amount of time that has passed. And then the other question that I had, there was testimony that he would receive packages at the residence. Was there any evidence in the record to suggest that he was receiving bills, statement credit cards, anything beyond just the convenience of using her address for the receipt of packages? The only evidence that we had is that he whenever he chose to have items sent to the house, that it came and we had the one evidence I think from UPS that was delivered there. The other evidence that we had was that Google lists his address or her address as his address, one of his addresses, and that he had been doing this for years. So this is something that he has been expressing to people out there that this is one of his addresses. As we all know, we can have one, you know, we can have many addresses, but he is adopting this as one of the places that he lives and receives packages. And I think that's further evidence. With regard to the finances, the father of Mr. Ross refinanced or through his connections, he was able to have Ms. Hardy refinance for mortgage after the initial judgment. And it wasn't just a short period of time, but he was able to go to his bank and tell them that in fact, you know, because of his relationship, they did this. Wasn't that addressed though, didn't the court find that those actions and the involvement in the cleaning business wasn't sufficient at the time to terminate maintenance? And so I guess I'm trying to ascertain what has changed since that time for this court to draw a different inference from those interactions. Well, at the time of the first appellate court opinion, you had one year of relationship. You had a short period of time of him working in the business. He has now been working in this business and sharing profits for over 10 years. As far as the level of what's before and now, I apologize, Justice, I wasn't around the first time, but just the length of time that he's been doing this, the way that they interact, the way that he does stuff, the way that he goes with her to buy supplies, the way that in my opinion, that they share profits. I think the length of time in doing that is something as to, you know, obviously they, I mean, they have different profit levels. Some houses are 150. If you saw our thing, some are a hundred, some are 85. And I don't know the difference between before and now. And as far as, I hope I've answered that question. I know I'm about out of time. It's my, our request as appellee that the court affirm the opinion of the trial court. I think the trial court had a well-reasoned opinion based upon the evidence and based upon the standards that the court was to apply. I think that the court, you can see from the level of his order, analyzed all aspects of the evidence and the evidence fully supports the order of the court. We would ask the court to respectfully affirm the trial court. Thank you. Thank you, counsel. Mr. Schiffman, you have time for rebuttal. Thank you. I just have very, very brief rebuttal, and it's this. Mr. Scott's correct. He was not original trial counsel back 10 years ago, nor was I. I got in this case the first time for the appeal. So the only people who were at that appeal who are still here now are myself and Justice Connick. And I'm sure Justice Connick doesn't recall this because he has a lot more cases on his docket than I do, but I just would like to say this about Mrs. Hardy. Even back then, even back 10 years ago at the time of the original divorce, John Hardy didn't want to pay her a penny. He wanted to give her $14,000 or $15,000, and he didn't want to give her any maintenance whatsoever. This court awarded maintenance. He still doesn't want to pay maintenance to this woman, and he wants to blame her for everything. She's now before this court portrayed as a tax cheater and a liar. She's before this court apparently squirreling away thousands of dollars of profit from a business that pays her like maybe $300 or $400 a week. You do the math, and Mr. Hardy is a partner in this business. Mr. Hardy gets paid at the end of every day based upon the number of houses he pays. She gives him like 30 percent of the money, and that makes him a partner in this business? No. I'm sorry to say it's unfortunate, but Mrs. Hardy is not the villain in this case. All she wanted to do was start a business. All she wanted to do was use the proceeds of that business along with the maintenance that she was receiving to live a good life. Now, you're not supposed to consider fault in divorces, but they want to pile a lot of fault on this poor woman. Counsel, excuse me. I interrupt you for a minute. Those comments aside for a minute. Mr. Scott, opposing counsel, agreed that not all of the Heron factors were present here. The vacationing together wasn't present, but really stressed that there was spousal-like reliance between the two of them, especially when Laurie was in trouble. Is that what this court should find determinative here? No, because it's really not spousal. I'm sorry. It's not spousal reliance. It's employer-employee reliance. It's reliance that comes about because of the fact that they work together. Now, people who work together are not in a de facto marriage. Sometimes they can be, but in this case, they're not. There's no evidence to suggest it. I would respectfully say that that is not enough evidence to move this needle from intimate dating relationship to de facto marriage. I think the trial court should be reversed. Thank you. Thank you. Justice Connacht, do you have any further questions? I do not. Thank you. Justice Lannert, any further questions? I do not. Thank you. Okay. Thank you very much, counsel, for your arguments this morning. The court will take the matter under advisement and render a decision in due course. Court stands in recess at this time.